**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**(COLUMBIA DIVISION)**

| | | |
|---|---|---|
| LEWIS DANIEL BURNS, JR. and CONSOLIDATED PLANNING OF AMERICA, INC., | ) ) ) ) | Case Number:  3:25-cv-01596-CMC |
| Plaintiffs | ) ) | |
| v. | ) ) ) | |
| DALE R. POWELL, JR. a/k/a Ron Powell, SENIOR LIFE INSURANCE COMPANY, INC., ROBERT C. ELSBERRY, SR., POLICYNOLOGY, LLC, and ORBUS MARKETING, LLC, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**
**(Jury Trial Demanded)**

**COMES NOW** Lewis Daniel Burns, Jr. ("Burns") and Consolidated Planning of America,

Inc. ("Consolidated Planning"), by and through undersigned counsel, and files this Complaint on

the various causes of action set forth below, respectfully showing the Court the following:

**PRELIMINARY STATEMENT**

Lewis Burns Jr. is a highly accomplished insurance agent and the founder of Consolidated

Planning of America, Inc., an insurance agency.  He recruits, trains, and develops sales agents to

enter into agency agreements with the insurance companies he represents.  One of his agency

agreements was with Senior Life Insurance Company, Inc. ("Senior Life"), a final expense insur-

ance company.  From around 2014 through 2024, he generated millions of dollars in revenue for

Senior Life.  Despite his record for generating revenue, Senior Life terminated Burns without notice.  It then sought to prevent him from working in the final expense insurance industry through restrictive covenants.

This action seeks damages for breaches of contract, conversion, conspiracy to commit conversion, tortious interference with business relations, defamation, fraud, conspiracy to defraud, and negligent misrepresentation.  It seeks a declaration that the restrictive covenants in Senior Life's Agency Agreement with Burns are unlawful and unenforceable. To that end, this action requests a speedy hearing on the declaratory-judgment action, pursuant to Fed. R. Civ. P. 57, and seeks injunctive relief.

## PARTIES AND JURISDICTION

1.  Plaintiff Burns is a citizen of Columbia, South Carolina, County of Richland.  He is the founder and CEO of Consolidated Planning.  Consolidated Planning was formally organized under the laws of the State of South Carolina in June 2024.  Prior to the incorporation, Burns was doing business as *Consolidated Planning*. Consolidated Planning is an insurance agency.

2.  Plaintiff Consolidated Planning is a corporation organized under the laws of the State of South Carolina. Its principal place of business is located at 1803 Hampton Street, Columbia, South Carolina 29201. It received commissions from Defendant Senior Life.

3.  Upon information and belief, Defendant Dale R. Powell, Jr. ("Powell") is an individual who resides in Thomasville, Georgia.  Further, upon information and belief, Powell is a citizen of the State of Georgia. He is the CEO for Senior Life Insurance Company. Upon information and belief, Powell is also the founder of Policynology, LLC.

4.  Defendant Senior Life is a corporate entity organized under the laws of the State of Georgia. Its principal place of business is located at 1 Senior Life Lane, Thomasville, Georgia

31792, in Thomas County, Georgia. Senior Life is authorized to transact business in South Carolina and does business in South Carolina.

5.     Defendant Robert C. Elsberry, Sr. ("Elsberry"), upon information and belief, is a citizen of Florida. Upon information and belief, he was the Chief Executive Officer and President of Financial Legacy Group, LLC, or its principal owner.  According to Florida's Division of Corporations, it dissolved in 2019.  Financial Legacy Group, LLC was once formally organized under the laws of the State of Florida, with its principal place of business located at 1315 Club Lane, Lorida, Florida, County of Highlands.

6.     Defendant Policynology, LLC ("Policynology") is a limited liability company organized under the laws of the State of Georgia.  Upon information and belief, all members of Policynology are citizens of Georgia.  Policynology sells insurance leads.  An insurance lead is a prospective customer that could buy insurance offerings from an insurance agent or agency. Policynology provided leads to Burns and Consolidated Planning from its principal place of business, in Thomasville, Georgia, to Burns and Consolidated Planning in Columbia, South Carolina.

7.     Defendant Orbus Marketing, LLC ("Orbus") is a limited liability company organized under the laws of the State of Florida.  Upon information and belief, all members of Orbus are citizens of Florida.  Upon information and belief, Orbus has a call center that generates customer leads that are then provided to Policynology.

8.     This Court has jurisdiction over this action, under 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of South Carolina and citizens of Georgia and Florida, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     Venue is proper in this district, under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

10.     Burns is an insurance agent and agency founder in the *final expense life insurance* industry. Final expense life insurance provides benefits covering monetary obligations incurred at death by the family of the deceased, including professional funeral services, coffins and related costs, and—in some instances—payment of a deceased's debts.

11.     Burns entered into Insurance Agency Agreements as an independent contractor, to sell final expense products for the following companies: (a) Lincoln Heritage Life Insurance Company; (b) Transamerica Life Insurance Company; and (c) Mutual of Omaha Insurance Company.

12.     Burns, doing business as Consolidated Planning, was an immediate success, earning a reputation for selling final expense products for the above three companies, as well as in recruiting, training, and developing agents *down-line* from him.

13.     Burns recruits, trains, and develops sales agents to enter into an agency agreement with the insurance companies he represents.  They report to him as an *up-line agent* or *up-line agency*—for example, Consolidated Planning—and they become his down-line agents.  If any of the agents form their own agencies, as Burns did in forming Consolidated Planning, and recruit agents who enter into agency agreements with the companies Burns represents, they also become Burns' down-line agents or agencies. Whenever a final expense product is sold or written, Burns receives a portion of the commissions upon the sale, as well as whenever any policies are renewed by the customer.  Similarly, when those agents recruit others to sign an agency agreement and sell policies, they receive a portion of the commissions as does Burns.  Burns earned a stellar reputation for inspiring his down-line agents, in recruiting their own agents, to form selling agencies.

14.     As a result of Burns' talents and reputation, he was approached by Elsberry to become a down-line agent to him, selling the final expense product(s) with Senior Life.

15.     Sometime in 2014, Burns met with Senior Life's founder, Dale Powell, and his son, Defendant Dale Powell Jr. Dale Powell Jr. is the current CEO of Senior Life. Upon information and belief, he is also the founder of Policynology.

16.     Policynology is an alter ego of Powell. It provided customer leads to Burns and his agency, Consolidated Planning, after Policynology acquired some of the leads from Orbus.

17.     After that meeting, Burns began selling final expense products for Senior Life. Under the terms of his agreement, Burns is an independent contractor.

18.     Around September 2014, Burns entered into an agency agreement to sell final expense on behalf of Senior Life.  Renewed agency agreements were entered into in 2014 and 2023. The most recent Agency Agreement was executed in or around June 2023 ("Agreement" or "June 2023 agreement"). **Exhibit A**.

19.     Along with selling final expense products for Senior Life, Burns recruited a team of agents to sell Senior Life's products.  The personnel he recruited, trained, and developed previously worked for him as down-line agents and agencies on behalf of Lincoln Heritage, Transamerica, and Mutual of Omaha.  Recruiting agents is part of Burns' Agreement with Senior Life.

20.     Burns was a top agent and recruiter throughout his time with Senior Life. In or around 2020, Burns became Senior Life's top producer, the first individual down-line agent in its history to personally achieve or earn well over a million dollars in income (excluding income from his down-line agents and agencies) in a one-year period. In 2022, he repeated that performance, earning approximately $1.1 million. Burns earned even more in 2023, approximately $1.3 in personal income.  Prior to Burns' retaliatory termination, described below, for 2024, he was on track

to earn more than $1.5 million in personal income (all excluding gross revenue generated by his down-line agents and agencies).

21.     Burns' down-line agency, Consolidated Planning, became one of the fastest growing final expense agencies in the United States, recruiting and training down-line agents and agencies all over the country.

22.     All along, Senior Life knew Burns, and several of the above described down-line agents, had agency agreements with other insurance companies. It never objected to Burns selling final expense products for other insurance companies. Yet despite Burns being an independent contractor in every renewal agreement with Senior Life—receiving IRS Form 1099 from Senior Life—Senior Life insisted that Burns stop selling the final expense product(s) of other insurance companies and sell final expense product(s) for Senior Life exclusively about two years ago.

23.     Under the Agency Agreements with Senior Life—including the agreement entered in or around June 2023—Burns was an independent contractor for Senior Life.

24.     Under the June 2023 agreement and the others, Burns is entitled to receive commissions for sales of final expense policies procured by his efforts and that of his down-line agents and agencies.

25.     In September 2024, Senior Life, through Powell lowered Burns commission contract under the June 2023 agreement to get Burns' attention.

26.     After Burns tried to resolve his commission reduction in good faith, which Senior Life ignored, Burns requested arbitration on September 30, 2024.[1] **Exhibit B**.

---

1. Powell, Elsberry, Policynology, and Orbus are not parties to the Agreement and its arbitration clause. Because they are not parties to the Agreement and its arbitration clause, they should not be permitted to enforce the arbitration clause. Similarly, Consolidated Planning is not a party to the Agreement or its arbitration clause; so that clause does not apply to it.

27.     Senior Life ignored that request too and terminated Burns.

28.     That is, despite being a top salesperson and recruiter, every year, Senior Life pur-ported to terminate Burns without notice on October 4, 2024. **Exhibit C**.  Senior Life has withheld commissions that he earned and still owes him to this day. Further, Senior Life's termination letter alleged Burns owes it more than $500,000.

29.     Burns termination—without notice—came even though he was an independent contractor each year he sold final expense products for Senior Life.

30.     Later, in a letter dated October 22, 2024, Senior Life threatened to take the com-missions owed to Burns due to alleged violations of the restrictive covenants in the Agreement. **Exhibit D**.

31.     Around that time, Senior Life and Elsberry offered Burns' down-line agents higher commissions to sever ties with Burns' agency, Consolidated Planning.

32.     Similarly, around that time and after, upon information and belief, Powell told oth-ers—inside and outside of Senior Life—that Burns is schizophrenic and suffers from mental ill-ness.

## CAUSES OF ACTION

### COUNT ONE
### (Breach of Contract against Senior Life)

33.     Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of this Complaint, as if fully set forth herein verbatim.

34.     As will be alleged later in this Complaint, there are provisions in the June 2023 Agency Agreement with Senior Life that should be declared unlawful and unenforceable because of being unreasonable and overly broad. Alternatively, the entire June 2023 Agreement should be

invalidated or—as a further alternative—the restrictive covenants should be "blue penciled," *see* O.G.C.A. § 13-8-53(d).

35.    Burns, as it relates solely to selling final expense policies, in executing the Agreement, entered a valid and enforceable contract.

36.    Burns performed all obligations pursuant to the Agreement, including selling final expense insurance products and generating commissions owed by Senior Life to Burns and Consolidated Planning.

37.    Senior Life breached the Agreement by:

a.    Senior Life, through its conduct, effectively reclassified Burns from an independent contractor to a statutory employee, violating the contractual terms and his rights.

b.    Senior Life unilaterally reduced insurance policy sales commissions to which Burns was entitled under its Agreement with Burns, despite lacking authority to do so.

c.    Senior Life unilaterally refused to negotiate in good faith to settle the controversy regarding the reduced commissions, further violating its obligations under the Agreement.

d.    Pursuant to a dispute resolution provision of the Agreement, Burns demanded arbitration to resolve the controversy relating to the commissions. Senior Life refused to respond or participate in arbitration in direct violation of the Agreement.

e.    Senior Life improperly and without contractual basis charged Burns with hundreds of thousands of dollars (in excess of $500,000) for "bogus" client leads that were

neither genuine, productive, nor legal,[2] as well as other unwarranted monetary charge-backs, thereby maliciously seeking to reduce Burns' commission payments.

      f.      Senior Life has unilaterally refused to pay Burns present and future commissions estimated in the millions of dollars, despite Burns and his down-line agents and Consolidated Planning's performance and ongoing obligations under the Agreement.

38.      Senior Life's above-described actions were unilateral, without contractual justification, and resulted and will continue to result in significant monetary harm to Burns and Consolidated Planning.

39.      Defendant Senior Life's breaches of the Agreement were without legal justification or excuse.

40.      As a direct and proximate result of Senior Life's breaches, Burns has suffered and continues to suffer substantial damages, including but not limited to lost commissions, improperly assessed charges and other related damages, in an amount to be proven at trial but believed to exceed $5,000,000.

## COUNT TWO
### (Retaliatory Termination of Contract against Senior Life)

41.      Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if fully set forth herein verbatim.

42.      Burns acted as an independent insurance sales agent, and founded an agency, Consolidated Planning, which entitle him to commissions for final expense policies procured on behalf of Senior Life.

43.      Burns was an independent contractor.

---

2. *See* Compl. ¶¶ 106–130.

44.    Burns performed all obligations under the Agreement in good faith.

45.    Senior Life, in violation of its contractual duties and in retaliation of Burns raising legitimate concerns, unlawfully terminated the Agreement after Burns questioned Senior Life's conduct and demanded dispute resolution.

46.    Specifically, Burns raised the following:

a.    Concerns about Senior Life's liquidity, which impacts its ability to honor any final expense policy sold by Burns and any of his down-line agencies or agents, based on the Georgia Department of Insurance's mandatory financial statement disclosure requirements, which Senior Life was obligated to address under state law.

b.    Burns questioned Senior Life's unilateral reduction of his commission payments, which violated the Agreement between Burns and Senior Life.

c.    Burns declared the commission payment reduction a "controversy" and demanded resolution through good faith settlement negotiations and, if necessary, arbitration in accordance with the dispute resolution provision(s) of the Agreement.

47.    On September 30, 2024, Burns emailed his request for arbitration.

48.    Only four days after Burns' resolution demand, on October 4, Senior Life retaliated by issuing a termination letter purporting to end the June 2023 Agreement.

49.    Further, in its termination letter, Senior Life sought to improperly charge Burns for over $500,000 in bogus and fraudulent chargebacks, including for purported leads that were non-productive, fictitious, or otherwise invalid.

50.    Senior Life's actions were taken in bad faith, lacked legal justification, and were intended to punish Burns for raising valid concerns about Senior Life and in exercising his contractual rights under the Agreement.

51.     Senior Life has caused substantial financial harm to Burns, including the loss of commissions owed under the June 2023 Agreement—and any prior agreement—reputational damage, and other damages.

52.     Senior Life breached the Agreement by:

a.     Terminating the June 2023 Agreement in bad faith and in retaliation for Burns raising concerns about Senior Life's liquidity, as required by Georgia law.

b.     Retaliating against Burns for questioning the unilateral reduction of his commissions and demanding resolution of the issue through negotiation and arbitration.

c.     Attempting to impose improper, fraudulent, and illegal chargebacks exceeding $500,000 without any contractual basis or justification.

53.     Senior Life's retaliatory termination was not only unjustified under the Agreement with Burns but also intended to punish and deter Burns from exercising his contractual and legal rights.

54.     Senior Life's retaliatory termination was willful, intentional, malicious, and carried out in bad faith, entitling Burns to all available remedies under the law.

**COUNT THREE**
**(Declaratory Judgment (28 U.S.C. §§ 2201–2022))**

55.     Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint as if fully set forth verbatim.

56.     Burns operates as an independent contractor and has relied upon business relationships with down-line agents and down-line agencies to build, grow, and maintain his livelihood.

57.     Burns' success is highly dependent on his ability to freely recruit, train, work with, and maintain business relationships with down-line agents and down-line agencies.

58.     Burns and Senior Life entered into the Agreement, which contains certain restrictive covenants, including prohibitions on the solicitation of Burns' former down-line agents and down-line agencies following the termination of the Agreement.

59.     The restrictive covenants impose restraints on Burns' ability to do the following:

a.      Solicit former down-line agents and down-line agencies that he recruited or were recruited by either his down-line agents or down-line agencies, but not by Senior Life. Senior Life not only never engaged in the recruiting process, but also never engaged in the training process in any manner whatsoever, be it materials, techniques, principles, or otherwise;

b.      Conduct business within a defined or generally specified geographic territory; and

c.      Compete effectively to earn a livelihood.

60.     Under Georgia law, restrictive covenants, to include non-solicitation clauses, must be:

a.   Reasonable in time, geographic scope, and in the activity restrained; and

b.   Necessary to protect a legitimate business interest of the party enforcing the restriction(s) under O.C.G.A. § 13-8-53.

61.     The restrictive covenants in the Agreement:

a.      Fail to define any geographic limitations or are unreasonably broad in geographic scope.

b.      Are overly broad in the types of activities restricted.

c.      Are unreasonable in duration and overly restrictive.

d.      And do not protect any legitimate business interest.

62.     As a result, these restrictive covenants are unenforceable, void, and contrary to Georgia public policy under O.C.G.A. § 13-8-50, *et seq.*

63.     Senior Life has wrongfully invoked and enforced the invalid restrictive covenants as a justification to:

        a.     Prevent Burns from engaging in lawful competition and recruitment of down-line agents and down-line agencies; and

        b.     Withhold several millions of dollars in earned commissions that Burns earned and is rightfully owed and will be owed in the future under the terms of the Agreement or applicable law.

64.     Burns is entitled to a declaration that the restrictive covenants are invalid and unenforceable under Georgia law and to injunctive relief prohibiting Senior Life from enforcing or attempting to enforce those provisions of the Agreement.  Alternatively, this Court should "blue-pencil"—that is, modify the restrictive covenants in the Agreement.

65.     An actual controversy exists between Burns and Senior Life regarding the validity and enforceability of the restrictive covenants in the Agreement.

66.     Burns seeks a judicial declaration that:

        a.     The restrictive covenants prohibiting Burns from soliciting or recruiting former down-line agents are unenforceable as they are overly broad, unreasonable, and contrary to Georgia public policy.

        b.     Senior Life cannot rely on these invalid provisions as a justification for withholding earned or to be earned commissions or depriving Burns of his ability to earn a living.

67.     Pursuant to 28 U.S.C. §§ 2201–2202, Burns requests that this Court enter a declaration that the restrictive covenants are unlawful, void, and unenforceable.

68.     Burns also requests an order for a speedy hearing of this declaratory-judgment action. Fed. R. Civ. P. 57.

## COUNT FOUR
## (Injunctive Relief)

69.     Burns and Consolidated reallege and incorporate by reference all prior paragraphs of the Complaint as if set forth herein verbatim.

70.     Senior Life's enforcement and assertion of invalid restrictive covenants is causing ongoing irreparable harm to Plaintiff Burns by:

    a.     Preventing Burns from conducting lawful and competitive business activities; and

    b.     Depriving Burns of critical income through the unjust withholding of earned and future commissions.

71.     Burns has a substantial likelihood of success on the merits because the restrictive covenants are overly broad, unreasonable, and do not protect a legitimate business interest under Georgia law.

72.     The balance of equities favors Burns because Senior Life's actions unjustly harm Burns' livelihood while providing no legitimate benefit to Senior Life.

73.     Injunctive relief is in the public interest as Georgia law and public policy favor competition and restrict unreasonable restraints on trade.

74.     Burns requests a preliminary and permanent injunction restraining Senior Life from:

    a.     Enforcing the non-solicitation provisions in the Agreement;

b.     Withholding the commissions Burns earned and his future commissions based on invalid restrictive covenants; and

c.     Threatening or interfering with Burns' lawful business activities to earn a livelihood and contribute to or enabling others to do so.

## COUNT FIVE
### (Conversion)

75.     Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if repeated herein verbatim.

76.     As set forth above, Burns entered into the Agreement with Senior Life, where he earns and earned commissions on insurance policy sales, policy renewals, and new policy sales by his down-line agents and down-line agencies.

77.     Burns built and maintained a network of down-line agents and down-line agencies, the sales of which generated a substantial portion of his commissions.

78.     Burns earned and continues to earn commissions based on both present policy sales and renewals from policies written by Burns and his down-line agents and down-line agencies and these commissions continue to be withheld by Senior Life.

79.     Senior Life retaliatory terminated Burns' Agreement for malicious and improper reasons, including to:

a.     Steal Burns' rightfully earned and future commissions; and

b.     Poach and redirect Burns' down-line agents and agencies to Elsberry, allowing Elsberry and Senior Life to retain commission payments generated by Burns' down-lines.

80.     Following Burns' wrongful termination:

a. Elsberry and Senior Life converted Burns' presently earned commissions by withholding payment without justification;

b. Elsberry and Senior Life appropriated Burns' future commissions, including renewal commissions and future sales commissions from policies generated by Burns and his down-line agents and down-line agencies; and

c. Senior Life and Elsberry actively solicited and recruited Burns' down-line agents and down-line agencies to cut off his business opportunities and misappropriate the revenue he would have generated through these relationships.

81. Senior Life and Elsberry intentionally and unlawfully devised and implemented a plan to harm Burns by:

a. Conspiring to terminate Burns to gain control of Burns' down-line network and commissions generated from it;

b. Stealing policy sales and renewal commissions owed to Burns; and

c. Enriching themselves by reallocating Burns' commissions structure to themselves and, upon information and belief, other individuals and entities.

82. Burns has been significantly and irreparably harmed, suffering present financial losses, the loss of future income and business opportunities, damage to professional reputation, and substantial emotional and professional hardship.

83. Under Georgia law, conversion is the unauthorized assumption and exercise of ownership or control over property belonging to another in denial of or inconsistent with the owner's rights.

84. Burns has a clear property interest in the following:

     a.     Commissions earned through Burns' sales of insurance policies and renewals;

     b.     Commissions from policies sold and renewed by Burns' down-line agents and down-line agencies; and

     c.     Business opportunities derived from Plaintiff's down-line relationships.

85.     Senior Life and Elsberry wrongfully and without authorization converted Burns' commissions by withholding earned commission payments and appropriating future renewal and sales commissions for their own benefit.

86.     Senior Life's and Elsberry's conversion extends to Burns' relationships with his down-line agents and down-line agencies by recruiting them for their sole financial benefit, thereby depriving Burns of significant business income.

87.     Senior Life's and Elsberry's actions constitute willful, intentional, and malicious conduct, entitling Burns to compensatory and punitive damages.

## COUNT SIX
### (Conspiracy to Commit Conversion)

88.     Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if repeated herein verbatim.

89.     Under Georgia law, civil conspiracy occurs when two or more persons or entities associate together to accomplish an unlawful end or a lawful end by unlawful means, resulting in damages to the Plaintiff.

90.     Senior Life and Elsberry, among numerous others, directly and indirectly participating in the complained conduct, knowingly and intentionally entered into an agreement or plan to do the following:

a.    Terminated Burns' Agency Agreement to gain control over his commissions and down-line agents and down-line agencies, including the commissions they are earning or would have earned for Burns;

b.    Stole Burns' commissions and redirected his renewal commissions and down-line commission revenue to Senior Life and Elsberry, and upon information and belief, to other individuals and entities; and

c.    Poached Burns' down-line agents and down-line agencies to ensure Senior Life and Elsberry and, upon information and belief, to other individuals and entities, benefited from Burns' network without compensating him.

91.    The acts undertaken in furtherance of this conspiracy include the following:

a.    Retaliatory termination of Burns' Agreement;

b.    Soliciting and recruiting Burns' down-line agents and down-line agencies for Senior Life and Elsberry's sole benefit; and

c.    Retaining commissions and other monetary benefits rightfully owed to Burns.

92.    Senior Life's and Elsberry's conspiracy has proximately caused significant financial losses to Burns, including loss of commissions, future income and business opportunities. It also proximately caused reputational harm.

## COUNT SEVEN
### (Tortious Interference with Business Relations)

93.    Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of this Complaint, as if repeated herein verbatim.

94.    Burns had valid existing business relationships with his down-line agents and down-line agencies, which generated significant policy sales commission revenues.

95.     Senior Life and Elsberry had actual or constructive knowledge of Burns' business relationships and their importance to his professional success.

96.     Senior Life and Elsberry acted improperly, without privilege, when it offered Burns' down-line agents higher commissions to leave Burns' agency, Consolidated Planning.

97.     In offering Burns' down-line agents increased commissions to sever their relationship with Burns, Senior Life and, upon information and belief, Elsberry, acted purposefully and with malice and intent to injure.

98.     The increased commissions offered by Senior Life and Elsberry induced Burns' down-line agents not to continue doing business with Burns and Consolidated Planning.

99.     Senior Life and Elsberry intentionally and maliciously interfered with Burns' business relationships by engaging in the following unlawful conduct:

        a.      Recruiting and poaching Burn's down-line agents and down-line agencies;

        b.      Using wrongful means, including retaliatory termination and invalid restrictive covenants, to interfere with Burns' business relationships; and

        c.      Diverting Burns' commission revenue to themselves or, upon information and belief, other third parties.

100.    As a result of Senior Life's and, upon information and belief, Elsberry's interference, Burns has suffered significant financial damages, including lost commissions and professional opportunities.

**COUNT EIGHT**
**(Defamation)**

101.    Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if fully set forth herein verbatim.

102.    Powell made a false and defamatory statement about Burns. Specifically, he told others that Burns is schizophrenic and suffers from mental illness.

103.    As Powell told others that Burns is schizophrenic and suffers from mental illness, he published a false and defamatory statement about Burns.

104.    When Powell told others the false and defamatory statement about Burns, its communication was not privileged. Upon information and belief, Powell communicated that Burns is schizophrenic and suffers from mental illness within Senior Life and outside of Senior Life.

105.    Powell is at fault for publishing the defamatory and false statement about Burns because the statement was unreasonable and uttered with malice. Powell uttered the false and defamatory statement about Burns—and published the statement—to injure Burns and his business.

106.    As a result of Powell publishing the defamatory and false statement about Burns, Burns has special damages, including lost commissions, lost revenue, and professional opportunities.

## COUNT NINE
## (Fraud by Powell, Policynology, and Orbus)

107.    Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if fully set forth herein verbatim.

108.    Powell, on behalf of Policynology, falsely and fraudulently and with intent to defraud Burns and Consolidated Planning represented to them that the leads provided by Policynology came from Senior Life.

109.    Those representations were false in fact and known to be false by Powell at the time they were so made because Senior Life's leads come from Orbus and Policynology.  That is, many

of the telemarketing leads originate from Orbus.  Orbus provides the telemarketing leads to Policynology.  Policynology is an alter ego of Powell.  Burns and Consolidated Planning were never given information about Orbus or Policynology.

110.     Further, Powell misrepresented that all leads provided to Burns and Consolidated Planning's agents were lawful.  Yet Powell knew that Orbus and/or Policynology purchases call lists for individuals over sixty, relying on Orbus's call center in Morocco[3] to make calls to those individuals.  Moreover, Powell knew that many of the calls made by Orbus, to generate final expense leads, were made to individuals on the Do Not Call Registry and were thereby illegal in violation of federal law, specifically, the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*.

111.     Burns relied on Powell's representations and was thereby induced to use the leads because he was justified in believing they were lawful.  His down-line agents with Consolidated Planning also were justified in believing the leads were lawful.  Yet in relying on the leads listing individuals on the Do Not Call Registry—which were generated by Orbus, paid for by Powell's Policynology, and concealed as coming from Senior Life—Burns' and Consolidated Planning's chances of turning leads into new policies were reduced. Burns and Consolidated Planning were damaged from chargebacks for leads that were unlawful.

112.     By reason of the foregoing, Burns has suffered damage in a sum exceeding $300,000.

**COUNT TEN**
**(Conspiracy to Defraud by Powell, Policynology, and Orbus)**

---

3. Orbus's foreign call center was formerly located, upon information and belief, in Ukraine.  Upon information and belief, it moved to Morocco following the ongoing war between Russia and Ukraine.

113.    Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if fully set forth herein verbatim.

114.    Powell, Policynology, and Orbus conspired and agreed to defraud Burns and Consolidated Planning by concealing the source of the customer leads, the means by which the leads were generated, and that the leads were generated through lawful means.

115.    Powell, on behalf of Policynology, falsely and fraudulently and with intent to defraud Burns and Consolidated Planning represented to them that the leads provided by Policynology came from Senior Life.

116.    Those representations were false in fact and known to be false by Powell at the time they were so made because Senior Life's leads come from Orbus and Policynology.

117.    Orbus aided and assisted Powell and Policynology, in a scheme to conceal the source of the customer leads provided to Burns and Consolidated Planning.  Further, Orbus aided and assisted Powell and Policynology in supplying Burns and Consolidated Planning with customer leads that were not generated through lawful means by having its agents make calls to individuals on the Do Not Call Registry who then supplied this information to Policynology who passed on the customer leads to Burns and Consolidated Planning.

118.    By reason of the foregoing, Burns and Consolidated Planning has suffered damage in a sum exceeding $300,000.

**COUNT ELEVEN**
**(Negligent Misrepresentation by Powell and Policynology)**

119.    Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if fully set forth herein verbatim.

120.    Powell, on behalf of Policynology, negligently supplied Burns and Consolidated Planning leads that were not lawful because they were procured by telemarketers—that is, Orbus—calling consumers on the Do Not Call Registry.

121.    Powell, on behalf of Policynology, knew—or in his exercise of reasonable care—should have known that Burns and Consolidated Planning would justifiably rely on Powell's misrepresentations that customer leads were provided by Senior Life and were not illegal leads procured from individuals on the Do Not Call Registry and that were thereby poor quality or worthless leads.

122.    Burns and Consolidated Planning did justifiably rely on the misrepresentations by permitting Powell, on behalf of Policynology, to continue providing customer leads to them.

123.    Burns and Consolidated Planning could not have discovered Powell's misrepresentation in their exercise of due care because the source of customer leads was concealed by Powell as originating from Senior Life.

124.    Burns and Consolidated Planning have suffered harm as a result of the misrepresentations and concealment of Powell acting on behalf of Policynology.

**COUNT TWELVE**
**(Breach of Contract by Powell and Policynology)**

125.    Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if fully set forth herein verbatim.

126.    Burns has an agreement with Senior Life where it provides customer leads in exchange for premiums from life insurance policies sold by agents.

127.    Powell's alter ego, Policynology—not Senior Life—acquired the leads used by Burns and Consolidated Planning. In particular, Policynology acquired telemarketing leads for

prospective customers through Orbus. After acquiring those leads from Orbus, Powell's Policynology provided them to Senior Life.

128.    Upon information and belief, Policynology's registered agent address is Powell's personal residence.

129.    Powell, through Policynology, misrepresented the insurance leads that Senior Life agreed to provide Burns and Consolidated Planning came from Senior Life when they came from Orbus and Policynology.

130.    Burns and Consolidated Planning relied on Powell's statements that the leads provided were compliant with the law and genuine requests for information from consumers about Senior Life's final expense insurance offerings.

131.    Powell and Policynology breached the agreement it had with Burns because many leads were not tied to individuals who contacted Senior Life or any of affiliates or who were interested in purchasing final expense insurance from Senior Life or any of its affiliates.

132.    As a direct and proximate result of Powell and Policynology's breaches, Burns and Consolidated Planning has suffered and continues to suffer substantial damages, including lost commissions, improperly assessed charges and other related damages, in an amount to be proven at trial.

### COUNT THIRTEEN
### (Deceptive Trade Practices by Powell and Policynology)

133.    Burns and Consolidated Planning reallege and incorporate by reference all prior paragraphs of the Complaint, as if fully set forth herein verbatim.

134.    Powell, on behalf of Policynology, continues to assess charges against Burns for customer leads—the most recent charges occurring in December 2024. Burns cannot access the software to access the customer leads.

135.    Powell, on behalf Policynology, represented that the leads he provided Burns and Consolidated Planning were lawful. Further, he represented that his customer leads were not acquired through violation of the Telephone Consumer Protection Act.

136.    By making those representations, Powell, on behalf of Policynology, violated Georgia's Uniform Deceptive Trade Practices Act. O.G.C.A. § 10-1-370 *et. seq.*

137.    Burns and Consolidated Planning request injunctive relief, rescinding the obligation to pay for leads and stop Powell and Policynology—under the guise of Senior Life—from assessing charges to Burns and Consolidated Planning for leads neither can access.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Burns and Consolidated Planning respectfully request that this Court grant the following relief:

1.    A judgment in Burns' and Consolidated Planning's favor against Senior Life for compensatory damages arising from its breaches of contract, including for lost commissions, lost future commissions, lost business opportunities, and reputational harm.

2.    A judgment in Burns' and Consolidated Planning's favor against Senior Life for unjustified liabilities arising from bogus chargebacks in the amount of $500,000 or more.

3.    A judgment against Defendants Dale R. Powell, Jr., Policynology, LLC, and Orbus Marketing, LLC, for Burns' and Consolidated Planning's actual damages and punitive damages in excess of $5,000,000, with interest.

4.    Award pre- and post-judgment interest at the maximum rate allowed by law.

5.    Enter a declaratory judgment that the restrictive covenants in the Agreement are unlawful, unenforceable, and void under Georgia law.  Alternatively, modify (i.e., blue pencil) any of the restrictive covenants in the Agreement or hold the entire June 2023 Agency Agreement invalid.

25

6.      Order a speedy hearing on the declaratory-judgment action. Fed. R. Civ. P. 57.

7.      Issue an injunction under Georgia's Uniform Deceptive Trade Practices Act that rescinds any obligation that Burns has for the leads and stops assessing customer lead charges to Burns.

8.      Issue a preliminary and permanent injunction prohibiting Senior Life from:

    a.      Enforcing or attempting to enforce the non-solicitation provisions;

    b.      Withholding Burns' and Consolidated Planning's earned commissions based on these invalid provisions; and

    c.      Interfering with Plaintiffs Burns' and Consolidated Planning's lawful business activities.

9.      Award Burns and Consolidated Planning their reasonable attorneys' fees and costs incurred in bringing this action by law or equity; and

10.     Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs Burns and Consolidated Planning demand a trial by jury on all issues so triable.

Dated: March 11, 2025

Respectfully submitted,

/s/ Clarence Davis
Clarence Davis (Fed. ID 433)
THE CHARLESTON GROUP
P.O. Box B
Columbia, South Carolina 29202
Phone: (803) 606-6309
Email: clarence.davis4215@gmail.com

Aaliyah Russell *(pro hac vice to be submitted)*
THE CHARLESTON GROUP
P.O. Box 1762
Fayetteville, North Carolina 28302
Phone: (910) 485-2500
Email: arussell@charlestongroup.com

Timothy Lorick *(pro hac vice to be submitted)*
THE CHARLESTON GROUP
P.O. Box 1762
Fayetteville, North Carolina 28302
Phone: (910) 485-2500
Email: tlorick@charlestongroup.com

*Counsel to Lewis Daniel Burns Jr. and Consolidated Planning of America, Inc.*